**CONCUR; and Opinion Filed July 24, 2019.**

In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00272-CR

## CHRISTOPHER ALLEN DAVIS, Appellant
## V.
## THE STATE OF TEXAS, Appellee

**On Appeal from the Criminal District Court No. 5**
**Dallas County, Texas**
**Trial Court Cause No. F15-76601-L**

## CONCURRING OPINION

Opinion by Justice Pedersen, III

**"Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation."**

*Crawford v. Washington*, **541 U.S. 36, 68–69 (2004).**

The panel has affirmed the trial court in this case, and I agree with that conclusion. I write separately to address the confrontation issue raised by appellant in his third issue. I believe appellant is due an answer to the question he raises, and I believe litigants, counsel, and trial courts would benefit from a careful consideration of the important constitutional issue he raises. I would like our Court to speak clearly concerning how the Confrontation Clause should apply in the case of a sexual assault examination when the victim is not available to testify at trial. Upholding a defendant's civil liberties in a difficult case can complicate the trial process. It can also cause consternation among those observing the process. But doing so is ultimately required by our oath to defend the Constitution.

**Testimoniality[1] Under the Confrontation Clause**

As the majority asserts, the Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The fundamental purpose of the Confrontation Clause is to secure the opportunity of cross-examination. The admission of testimonial hearsay forecloses cross-examination, thus depriving a party of his principal tool to test "the believability of a witness and the truth of his testimony." *Johnson v. State*, 490 S.W.3d 895, 909 (Tex. Crim. App. 2016) (citing *Davis v. Alaska*, 415 U.S. 308, 316 (1974)). For this reason, where testimonial evidence is at issue, "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004). It is undisputed that D.R. was unavailable to testify at trial and that appellant had no opportunity to cross-examine her before her death. The majority finds it unnecessary to determine whether D.R.'s statements during her forensic sexual assault examination were testimonial. I disagree and ask the indulgence of readers as I attempt to give the issue its due.

The *Crawford* Court did not attempt to define "testimonial" in this context. 541 U.S. at 68 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'"). Over time, however, the Supreme Court has given us sufficient guidance to create a roadmap for determining testimoniality. The ultimate question is whether, within the exchange at issue, the declarant makes statements that bear witness against the defendant. *Id.* at 51 (The Confrontation Clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'").

Justice Scalia, the author of *Crawford*, set forth the test for such statements in *Davis v. Washington*: Statements are testimonial when the circumstances objectively indicate that the primary purpose of the questioning is to establish or prove past events that are potentially relevant

---

[1] I cannot recall where, if anywhere, I first heard this word. But I have adopted it in an effort to assist the discussion linguistically.

to a later criminal prosecution. 547 U.S. 813, 822 (2006). The test contains three main components: the circumstances of the case, objective analysis, and the primary purpose. A court determining the testimoniality of a statement moves through those components in order.

### 1. *The circumstances of the case*

The court looks first to all relevant circumstances. *Michigan v. Bryant*, 562 U.S. 344, 369 (2011). Who is questioning the declarant? He need not be a law enforcement officer to trigger confrontation concerns, although the closer the questioner is to law enforcement, the more likely the statement elicited will be testimonial. *See Ohio v. Clark*, 135 S. Ct. 2173, 2182 (2015) ("Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers."). The Supreme Court has suggested an individual conducting an interrogation for the police may be considered an agent of the police for purposes of confrontation analysis. *Davis*, 547 U.S. at 823 n.2 (considering acts of 9-1-1 operator to be acts of police for purposes of opinion).

Similarly, when the questioning takes place is significant. A statement made during an emergency situation in order to obtain immediate assistance is not likely testimonial. *Id.* at 822. A statement that explains "what happened" rather than "what is happening" is more likely to implicate confrontation issues. *Id*. at 830.

And where the questioning takes place can be of consequence. A location under the control of law enforcement lends itself to the "formality" that accompanies testimonial statements; a statement in an exposed public area is distinguishable from a police station house. *Bryant*, 562 U.S. at 366. Formality requires "surroundings adequate to impress upon a declarant the importance of what he is testifying to." *Clark*, 135 S. Ct. at 2184 (Scalia, J., concurring).

*2.      Objective analysis*

Rather than inquiring into the subjective concerns of the parties in a particular encounter, we are to analyze objectively the circumstances of the case and the statements and conduct of the parties. *Bryant*, 562 U.S. at 360; *see also Wall*, 184 S.W.3d at 742–43 ("[W]hether a statement is testimonial under *Crawford* is determined by the standard of an objectively reasonable declarant standing in the shoes of the actual declarant.").

*3.      Determining the primary purpose*

Having compiled the circumstances of the case and climbed into the shoes of an objective observer, a court is ready to determine the primary purpose of the interrogation or interview. This analysis "sorts out . . . *who is acting as a witness and who is not*." *Clark*, 135 S. Ct. at 2184 (Scalia, J., concurring; emphasis in original). To the extent possible, we review both questions and answers. We ask whether the questions are intended to investigate a possible crime. *Davis*, 547 U.S. at 830. And we ask whether the answers recount how potentially criminal past events began and progressed. *Id.* If a reasonable person would conclude that the statements accomplish what a witness does on direct examination, then the declarant is bearing witness, and the statements are testimonial. *Id.*

The Supreme Court's consistent use of the adjective "primary" indicates the possibility that an interview may have more than one purpose. We know that an interview can "evolve" from one purpose to another. *See id.* at 828 (conversation initially determining need for emergency assistance can evolve into testimonial statements once initial purpose has been resolved). "This presents no great problem," as trial courts, through limine procedures, "should redact or exclude the portions of the statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence." *Id.* at 829.

## Were D.R.'s Statements Testimonial?

Whether a statement is testimonial is a question of law. *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006). We review a trial court's decision on testimoniality de novo. *Id.*

I would begin consideration of appellant's third issue by addressing the relevant circumstances of D.R.'s forensic sexual assault exam, which Dr. David Rahn referred to as an "ACA," an Alleged Criminal Assault exam. Testimony and records establish that, at Parkland, sexual assault exams are performed by a faculty member of UT Southwestern Medical School. The process can take four to six hours. Rahn explained that these exams begin with a history. He asks the patient for information about the assault to guide him in the treatment he will provide and in collecting evidence. The patient is examined "head to toe" for any injuries, including a vaginal exam for internal injuries. Swabs are taken for potential evidence; slides may be prepared. Medication is offered to treat sexually transmitted diseases including HIV. The victim's clothes are taken and are submitted with the sealed sexual assault kit to the Southwestern Institute of Forensic Sciences, Dallas County's forensic laboratory service provider.

Rahn questioned and examined D.R., obtaining information about the assault, including: the identities of the two men who raped her; descriptions of oral, vaginal, and anal penetrations; the location of the assault; and a report of explicit threats. D.R. was required to undergo the exam at Parkland, rather than at a nearby hospital or in the office of her own doctor. At Parkland, records indicate she was assigned a police case number. The process was memorialized on two printed forms, a four-page "Violence Assessment" and a nine-page "Sexual Assault Examination" form. The latter includes a section titled "Law Enforcement Information" and an authorization and release allowing evidence to be collected and copies of all medical records to be sent immediately to the police department and district attorney's office. As to medical observations, Rahn noted injuries included bruising, painful defecation with loose stool, and pain in the tissue separating her

vaginal and anal areas that could have been caused by either vaginal or anal penetration. D.R. had showered, used mouthwash, urinated, and defecated before the exam, which could have made evidence collection more difficult. But DNA evidence collected did match Norton.

We can know the actions and conduct of D.R. only as they appear in Rahn's report and testimony. He described D.R.'s general appearance as "upset and disheveled" and her emotional status as "upset but cooperative." She freely answered the questions he asked her. And the answers he elicited were the time and location of the assault, the identity of her assailants, the nature of their assaultive conduct, and the injuries she suffered as a result. An objective analyst could certainly conclude that the purpose of those questions was to obtain the same information D.R. would have given on direct examination at trial. I concede that Rahn was not employed by law enforcement. But he testified concerning his task to collect evidence of the assault and to convey it to law enforcement's forensic examiners. Indeed, the title Rahn gave his examination—an Alleged Criminal Assault exam—speaks to his primary purpose in examining D.R. And while the setting and process of the exam were not as "formal" as a police station interview, surely the lengthy series of interviews and intrusive examination provided "surroundings adequate to impress upon a declarant the importance of what [she] is testifying to." *Clark*, 135 S. Ct. at 2184.

The State contends that the sole purpose of the exam was medical treatment, but it does not point to circumstances around the exam, or to conduct of D.R. or Rahn, that supports its conclusion. It states that "[a]ppellant presented no evidence that D.R. made her statements to any law enforcement officials or that she made her statements for the primary purpose of creating an out-of-court substitute for trial testimony, or for making a record to establish or prove past events potentially relevant to [a] later criminal prosecution." Once appellant objected to the evidence on confrontation grounds, however, the burden shifted to the State to show that the evidence was admissible under the Sixth Amendment. *De La Paz v. State*, 273 S.W.3d 671, 681 (Tex. Crim.

App. 2007) (concluding State did not carry its burden to prove medical notes, which repeated child's statement that appellant caused her injury, were admissible under *Crawford* when child did not testify). When the State fails to carry that burden, it is error to admit the evidence. *Id.*

Here, the facts do not support a conclusion that D.R. undertook the Parkland exam—or that Rahn examined her—solely for medical purposes. She went first to a closer hospital, which surely could have provided medical help for her if that had been the only purpose of the examination. But hospital personnel told her they could not help her, that only Parkland could perform a sexual assault exam. The record indicates that, at Parkland, personnel give victims a police case number, ask questions to establish the facts of the assault alleged, collect evidence, and transfer that evidence to law enforcement. Just as 9-1-1 operators can act as agents of law enforcement when they gather information for the police, sexual assault examiners gathering evidence for the police appear to be within the realm of agents of law enforcement.[2]

The State relies on cases from our sister courts that conclude, often without analysis, that medical records are not testimonial. Records prepared solely for medical treatment purposes are generally not testimonial. But we cannot assume that, simply because the questioning is preserved within D.R.'s medical records, its purpose was solely medical treatment. Here the surrounding circumstances, viewed objectively, indicate that the primary purpose—what made the Parkland examination necessary and unique—was to establish facts that would be relevant to prosecution for D.R.'s assault. When D.R. answered the examiner's questions concerning what happened to her, she was literally bearing witness. Some of her answers may in fact contain information tied

---

[2] I note in this regard that certain aspects of forensic medical examinations of sexual assault victims are governed by statute. If the victim of such an assault reports it to law enforcement, the agency "shall request a forensic medical examination of the victim of the alleged assault *for use in the investigation or prosecution of the offense*." TEX. CODE CRIM. PROC. ANN. art. 56.06(a) (emphasis added). That agency must pay all costs of the examination; costs can be reimbursed by the Attorney General if the examination was performed by a physician, a sexual assault examiner, or a sexual assault nurse examiner. *Id.* art. 56.06(c). The agency or prosecuting officer's office may also pay all costs related to testimony of a medical professional concerning the results of the examination. *Id.* art. 56.06(d). However, the agency is not required to pay any costs for the victim's medical treatment. *Id.* art. 56.06(e).

It appears, thus, that a forensic inquiry requested by law enforcement and medical treatment can be separated, at least in the provider's billing records.

only to medical care, and that information could be admissible. But before admitting records showing medical diagnosis or treatment, a trial court must redact or remove inadmissible testimonial evidence from the records. *See Davis*, 547 U.S. at 829.

The State relies on a single opinion from this Court, *Paramo v. State*, No. 05-12-01325-CR, 2014 WL 1413794 (Tex. App.—Dallas Apr. 7, 2014, no pet.) (mem. op., not designated for publication), which neither defeats appellant's argument nor lessens the State's burden. The *Paramo* defendant lodged his confrontation objection because the complainant's medical records were offered through a custodian of records rather than through the physician who examined the complainant. The complainant herself was not unavailable: she testified at trial and was subject to cross-examination. *Id.* at \*6. *Paramo* does not help us apply any aspect of the Supreme Court's confrontation analysis to statements in medical records when the declarant is unavailable.

Rather than relying on *Paramo*, I would look to this Court's opinion in *Smith v. State*, No. 05-09-01408-CR, 2011 WL 3278528, at \*2 (Tex. App.—Dallas Aug. 2, 2011, pet. ref'd) (mem. op., not designated for publication). As in *Paramo*, the *Smith* defendant objected that medical records were offered without the opportunity to cross-examine the medical providers who created them, and the complainant actually testified at trial. *Id.* at \*1. But the *Smith* trial court analyzed the testimoniality of the complainant's medical records by going through them page by page. Within the records were specific pages identified as "the social worker form." The trial court determined that the form was not created for purposes of medical treatment and ordered those pages removed. *Id.* at \*2. We concluded the trial court correctly excepted the two-page social worker form from otherwise admissible medical records. *Id.* Thus, as a Court, we have precedent for requiring an exacting review of medical records and for removal or redaction of inadmissible testimonial material from those records.

I would conclude that the State did not carry its burden to prove that all of D.R.'s statements found within the records of her sexual assault exam were admissible in this case and that the trial court should have conducted the exacting review required by *Smith*, this Court's precedent. I would conclude that admitting some or all of those statements was error.


/Bill Pedersen, III/
BILL PEDERSEN, III
JUSTICE


180272CF.P05